24CA0668 Marriage of Cunningham 05-01-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0668
Weld County District Court No. 21DR30448
Honorable Kimberly B. Schutt, Judge

---

In re the Marriage of

Amber Cunningham,

Appellant,

and

Gregory Cunningham,

Appellee.

---

ORDER AFFIRMED

Division VII
Opinion by JUDGE LIPINSKY
Johnson and Hawthorne*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 1, 2025

---

Altitude Family Law, P.C., Daniel Zarnowski, Littleton, Colorado, for Appellant

Mark A. Dedrickson, P.C., Mark A. Dedrickson, Greenwood Village, Colorado, for Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Petitioner, Amber Cunningham (wife), appeals the district court's order denying her motion to increase the amount of maintenance she receives from respondent, Gregory Cunningham (husband), and her request for attorney fees and costs.  We affirm.

## I.    Background

¶ 2    Wife filed a petition for dissolution of marriage in August 2021.  The parties, who had been married for fifteen years when wife commenced the case, have four minor children.

¶ 3    The parties filed sworn financial statements with the court in October 2021, pursuant to C.R.C.P. 16.2(e)(6).  Husband submitted the parties' 2018 through 2020 tax returns together with his financial statement.  The parties had filed their 2020 tax return one month before making their disclosures.  (The parties routinely obtained extensions for their tax filings.)  The parties' 2020 tax return was their most recent return at the time of the proceedings, which concluded in December 2021.

¶ 4    The parties' total income of $231,250 in 2020 consisted of husband's W-2 income of $124,300 and his K-1 income of $106,950.  Husband was both an employee and a part owner of Grace Management & Investment Corporation.  At the time the

1

court entered the decree for dissolution of the parties' marriage (the decree), Grace Management's only shareholders were husband, his parents, and his brother.

¶ 5 Husband later testified that, as of December 2021, he had not yet received any 2021 tax documents from Grace Management. He said that he did not know the amount of his pass-through income for 2021 at the time because Grace Management did not provide him with his 2021 K-1 "until late into [2022]."

¶ 6 While the proceedings were pending, the parties, represented by counsel, negotiated a separation agreement and parenting plan (the agreement). During the negotiations, wife rejected husband's proposal to set $5,000 as her monthly earning potential — a figure that courts use to calculate maintenance if a spouse is voluntarily unemployed or underemployed, *see* § 14-10-114(8)(c)(IV), C.R.S. 2024, and to calculate child support, *see* § 14-10-115(5)(b)(I), C.R.S. 2024. Rather, wife asserted that her monthly earning potential was only $2,917. In addition, wife rejected husband's proposal to designate a portion of his shares in Grace Management as separate property; she took the position that the shares were marital property. The parties do not dispute that, during the

negotiations, wife "had a full opportunity to get a valuation of [husband's] stock shares if [she] wanted it."

¶ 7      The parties signed the agreement in December 2021.  It provided that wife would receive $365,111.25 — fifty percent of the marital property — primarily comprised of the marital home, which was encumbered by a mortgage and included mineral rights and two debt-free cars.  Husband's Grace Management shares would comprise the majority of his share of the marital property.

¶ 8      Under the agreement, husband agreed to pay wife $5,273 per month in maintenance for ninety months and $300 per month in child support "until terminated or modified pursuant to Colorado law."  The parties calculated husband's child support obligation based on a Colorado Judicial Branch child support worksheet.  *See* JDF 1821M, Worksheet B — Child Supp. Obligation: Shared Physical Care (revised Aug. 2024), https://perma.cc/MWM2-8H4L. In calculating husband's $300 obligation under the agreement, they set wife's monthly earning potential at $2,917 and husband's monthly income at $20,000; provided for an equal amount of overnight parenting time; and granted husband a $475 monthly

3

credit for paying the children's health insurance premiums. *See* § 14-10-115(4), (8), (10).

¶ 9     In January 2022, the court approved the agreement and entered the decree, which incorporated the agreement.

¶ 10    Husband's mother died two months later. Upon her death, husband received an additional six percent ownership interest in Grace Management and the associated income distributions.

¶ 11    In June 2022, wife filed a motion to modify spousal maintenance and child support (the motion to increase). In the motion to increase, wife asked the court to increase husband's monthly child support and maintenance payments because, following his mother's death, husband's "income ha[d] significantly increased as a result of his substantial increase" in Grace Management shares. Wife did not request an award of attorney fees and costs in the motion to increase.

¶ 12    The court entered a case management order and set a hearing on the motion to increase in October 2023 (the October hearing).

¶ 13    In advance of the October hearing, the parties filed a joint trial management certificate (the certificate), in which wife requested an award of attorney fees and costs pursuant to section 14-10-119,

C.R.S. 2024. In addition, in the certificate, wife did not challenge the validity or enforceability of the agreement or ask the court to vacate it.

¶ 14 One month before the October hearing, husband filed a motion to restrict wife's parenting time based on the children's reports that mother was abusing alcohol and exhibiting signs of mental illness. The court entered an order restricting wife's parenting time (the restriction order) based on its finding that husband had met his "burden of proof in relation to [wife]'s use of alcohol and mental health issues." The court said the restriction order provided wife with "a temporary time-out . . . to address her mental health issues and get therapy."

¶ 15 Wife testified at the October hearing and called husband's father as a witness. Husband also testified and called Gail Pickett, a vocational consultant, and his brother as witnesses.

¶ 16 The court entered its order on the motion to increase (the modification order) in February 2024. In the modification order, the court granted wife's request for an increase in husband's monthly child support payments, ordering husband to pay $1,400 per month in child support until October 2024, when he would owe

$1,150 monthly. However, the court denied wife's request for an increase in husband's monthly maintenance payments and denied wife's request for attorney fees and costs.

¶ 17     Wife appeals the court's denial of her request to increase husband's monthly maintenance payments and her request for an award of attorney fees and costs.

## II.     Analysis

### A.     The Court Did Not Err in Deciding that Wife Was Not Entitled to Increased Maintenance Payments

#### 1.     The Court Properly Considered Unfairness

¶ 18     We review the court's "evidentiary factual findings" following a bench trial for an abuse of discretion. *In re Marriage of Morales*, 2024 COA 2, ¶ 11, 546 P.3d 639, 642 (quoting *State Farm Mut. Auto. Ins. Co. v. Johnson*, 2017 CO 68, ¶ 12, 396 P.3d 651, 654). "We defer to the district court's factual findings if they are supported by the record." *In re Marriage of Garrett*, 2018 COA 154, ¶ 9, 444 P.3d 812, 815. "We review the district court's application of legal standards and legal conclusions de novo." *Id.*

#### a.     Substantive Law

¶ 19     Before July 1, 1993, section 14-10-122(1)(a) of the Colorado Revised Statutes provided that a court could modify a maintenance

6

award "only upon a showing of changed circumstances so substantial and continuing as to make the terms [of the decree] unconscionable." After the General Assembly's amendment, "[e]ffective July 1, 1993, the term 'unfair' was substituted for 'unconscionable.'" *In re Marriage of Swing*, 194 P.3d 498, 499 (Colo. App. 2008) (quoting Ch. 270, sec. 2, § 14-10-122(1)(a), 1993 Colo. Sess. Laws 1557).

¶ 20     In 1981 — years before the 1993 amendment — a division of the court of appeals considered the definition of "unconscionable" in section 14-10-122(1)(a), C.R.S. 1973, then in effect. *See In re Marriage of Anderson*, 638 P.2d 826, 827 (Colo. App. 1981). The division defined "unconscionable" as "not 'fair, reasonable, and just.'" *Id.* (quoting *In re Marriage of Carney*, 631 P.2d 1173, 1175 (Colo. App. 1981)). It held that, in analyzing a maintenance modification request,

> [t]he issue is not whether, based on the current financial circumstances of the parties, the court would have awarded the same amount of . . . support as that incorporated in the original decree. Instead, the question on a motion to modify is different: Have the terms of the original award become *unfair, i.e., unconscionable.*

*Id.* (emphasis added). The court's "use of 'i.e.' signal[ed] an intent to define the word to which it refers," *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009), indicating that the *Anderson* division intended to define "unconscionable" to mean "unfair."

¶ 21 After the 1993 amendment, Colorado courts continued to rely on *Anderson*'s interpretation of section 14-10-122(1)(a), C.R.S. 1973, when determining whether to modify maintenance obligations, treating "unconscionable" and "unfair" as synonyms. *See, e.g.*, *In re Marriage of Weibel*, 965 P.2d 126, 129 (Colo. App. 1998) (citing *Anderson* and noting that, in reviewing a motion for modification of maintenance, the question is whether "the terms of the original award [have] become unfair, *i.e.*, unconscionable" (quoting *Aldinger v. Aldinger*, 813 P.2d 836, 840 (Colo. App. 1991))); *In re Marriage of Aldrich*, 945 P.2d 1370, 1375 (Colo. 1997) (applying the same standard applied in *Anderson* to a request to modify child support); *In re Marriage of Bowles*, 916 P.2d 615, 618 (Colo. App. 1995) (citing *Anderson* for the proposition that "the dispositive determination" in considering a maintenance modification request is "whether, looking at all the circumstances

8

presently before the court, the terms of an original award have become unconscionable" and explaining that "mere increases or decreases in earnings do not require the conclusion that the amount of maintenance has become unconscionable"); *In re Marriage of Trout*, 897 P.2d 838, 840 (Colo. App. 1994) ("Whether a change is so substantial and continuing as to render the prior order unconscionable requires examination of the totality of the circumstances.").

### b. "Unfair" and "Unconscionable"

¶ 22    In the modification order, the court noted that the pre-1993 versions of section 14-10-122(1)(a) "used the term 'unconscionable' as the standard for modification" of maintenance awards and that "[t]he statute ha[d] since been amended to use the term 'unfair.'" But the court concluded that the "terms [we]re considered synonymous."

¶ 23    Wife disputes the court's assertion, contending that "unconscionable" and "unfair" are not synonymous.  She argues, based on the definition of the former in Black's Law Dictionary, that "unconscionable can be read as *shockingly unfair*, a much higher standard than just unfair."  (Emphasis added.)  *See* Black's Law

9

Dictionary 1841 (12th ed. 2024) ("[U]nconscionable" means "[s]hockingly unjust or unfair."). She asserts that, had the court viewed the motion to increase "through the lens" of "unfairness" rather than unconscionability, it would have increased the amount of husband's maintenance payments. We disagree.

¶ 24 Wife does not provide any support for her assertion that the General Assembly's substitution of "unconscionable" for "unfair" in section 14-10-122(1)(a), C.R.S. 2024, effected a change in the legal standard that courts apply in deciding whether to modify a maintenance obligation. We conclude otherwise. "Unconscionable" meant "not 'fair, reasonable, and just'" in 1981, *Anderson*, 638 P.2d at 827 (quoting *Carney*, 631 P.2d at 1175), and it had the same meaning after the General Assembly amended section 14-10-122(1)(a) in 1993. Nothing in wife's briefs suggests that the General Assembly sought to change the definition of "unconscionable" when it enacted the 1993 amendment.

¶ 25 In *Swing*, a division of this court expressly addressed the 1993 amendment's substitution of "unfair" for "unconscionable." 194 P.3d at 499-500. In that case, the appellant presented the opposite argument that wife asserts here; the appellant in *Swing* contended

that, despite the amendment, the test for modifying maintenance obligations — whether changed circumstances were so substantial and continuing as to make the terms unconscionable — remained the same. *Id.* In *Swing*, the appellant argued that the magistrate "applied the wrong standard when determining whether maintenance should be modified" because it was "misled by a change in the wording of [section 14-10-122(1)(a), C.R.S. 2007]," when it reduced her husband's maintenance obligation based on its finding that the original maintenance order had become "unfair." *Swing*, 194 P.3d at 499-500. She further argued that, although the General Assembly had replaced "unconscionable" with "unfair" in section 14-10-122(1)(a), C.R.S. 2007, the magistrate erred by applying an "unfair" standard because the "unconscionable" standard still applied. *Swing*, 194 P.3d at 499-500.

¶ 26    The division rejected her argument. *Id.* It held that "the magistrate applied the correct standard" under section 14-10-122(1)(a), C.R.S. 2007, because Colorado courts understood that the use of "unconscionable" in the pre-1993 statute imposed a "'fair, reasonable, and just' standard," and, therefore, the General Assembly's word change did not alter the legal standard for

11

modification of maintenance obligations. *Swing*, 194 P.3d at 499-500 (quoting *In re Marriage of Dixon*, 683 P.2d 803, 804 (Colo. App. 1983)).

¶ 27    In sum, Colorado case law does not support wife's argument that there is a material distinction between "unfair" and "unconscionable" for purposes of applying section 14-10-122(1)(a), C.R.S. 2024, and that the General Assembly's word substitution requires courts to apply a lower legal standard than "unconscionability" when considering requests to modify maintenance. Although wife may be technically correct that the two words do not have identical dictionary definitions, she fails to tell us why, following the statutory amendment, the words' different, but substantially similar, definitions require courts to reject the pre-1993 legal standard for determining whether "the terms of [an] original [maintenance] award [have] become unfair, *i.e.*, unconscionable." *Weibel*, 965 P.2d at 129 (quoting *Aldinger*, 813 P.2d at 840). Moreover, wife does not shed any light on *why* the General Assembly substituted "unfair" for "unconscionable" in section 14-10-122(1)(a), C.R.S. 2024, or whether it intended,

through the amendment, to effect a material change in the standard for modifying maintenance awards.

¶ 28      Accordingly, the court did not err by concluding that the General Assembly's substitution of "unfair" for "unconscionable" in section 14-10-122(1)(a), C.R.S. 2024, did not affect the test for whether a spouse is entitled to modification of a maintenance award.

### 2. The Court Conducted a Reasoned Analysis of the Statutory Maintenance Factors and Properly Declined to Increase Husband's Maintenance Payments

#### a. Standard of Review

¶ 29      "An award of maintenance is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion." *In re Marriage of Yates*, 148 P.3d 304, 313 (Colo. App. 2006). In addition,

> [t]he determination whether circumstances have changed is within the sound discretion of the district court based on the facts presented and, absent an abuse of that discretion, the court's ruling will not be disturbed on review. Further, on appeal, we must construe the evidence in the light most favorable to the prevailing party.

*In re Marriage of Nelson*, 2012 COA 205, ¶ 27, 292 P.3d 1214, 1219.

13

¶ 30     "[T]he determination of the credibility of witnesses and the weight, probative force and sufficiency of the evidence and the inferences and conclusions to be drawn therefrom are matters within the sole discretion of the trial court." *In re Marriage of Elmer*, 936 P.2d 617, 621 (Colo. App. 1997). "The trial court's factual findings may not be disturbed on appeal unless they are clearly erroneous and unsupported by the record." *In re Marriage of Salby*, 126 P.3d 291, 298 (Colo. App. 2005). "[A]n appellate court must view the evidence in the light most favorable to the trial court's order." *In re Marriage of Plesich*, 881 P.2d 379, 381 (Colo. App. 1994).

### b.     The Court's Analysis of the Statutory Factors and Changed Circumstances

¶ 31     Wife contends that the court erred by ignoring "any analysis regarding whether there [was] a substantial and continuing change in circumstances" and by not "meaningfully review[ing] pertinent factors related to" a modification of maintenance. We disagree.

¶ 32     The agreement said that maintenance "shall be subject to modification and/or termination in the event the statutory requirements under Colorado law are met for such a modification or

14

termination." Thus, "[t]he threshold question is whether [wife] has demonstrated 'changed circumstances so substantial and continuing as to make the existing terms unfair.'" *In re Marriage of Young*, 2021 COA 96, ¶ 12, 497 P.3d 524, 528 (quoting § 14-10-122(1)(a), C.R.S. 2020).

¶ 33    To determine whether the terms of a maintenance award are unfair, a "court *may* consider the guideline amount and term of maintenance and the statutory factors set forth in subsection (3) of this section," § 14-10-114(5) (emphasis added), including the following:

- the "amount of each party's gross income," § 14-10-114(3)(a)(I)(A);

- the marital property distributed to each party, § 14-10-114(3)(a)(I)(B), (3)(c)(IV);

- "[r]easonable financial need as established during the marriage," § 14-10-114(3)(a)(I)(D);

- the "financial resources of the recipient spouse . . . and the ability of the recipient spouse to meet [her] needs independently," § 14-10-114(3)(c)(I);

- the "financial resources of the payor spouse . . . and the ability of the payor spouse to meet [his] reasonable needs while paying maintenance," § 14-10-114(3)(c)(II);

- "[b]oth parties' income, employment, and employability, obtainable through reasonable diligence and additional training or education," § 14-10-114(3)(c)(V);

- the "age and health of the parties," § 14-10-114(3)(c)(IX);

- "[s]ignificant economic or noneconomic contribution to the marriage or to the economic, educational, or occupational advancement of a party," § 14-10-114(3)(c)(X); and

- "[w]hether the maintenance is deductible for federal income tax purposes by the payor and taxable income to the recipient," § 14-10-114(3)(c)(XII).

i. The Parties' Employment and Financial Resources

¶ 34 It was "undisputed that [husband's] income ha[d] increased substantially" since the court entered the decree "due to [his] greater number of shares in [Grace Management]."

¶ 35 Wife testified that she did not "go get a job" after she filed the petition for dissolution of marriage or after she "negotiated the

16

[agreement] with [husband,] and [she] recognized how much [she] would be getting in spousal maintenance and child support."

¶ 36 The court heard testimony at the October hearing that, by August 2022, wife had spent the entire $75,000 equalization payment that husband had made to her in January 2022. In addition, the evidence showed that wife had incurred tens of thousands of dollars in credit card charges during the first four months of 2022.

¶ 37 Wife testified that she was "[w]orking towards" finding a job between August 2022 and September 2023. She provided, as examples, her pursuit of a "personal trainer endeavor" and her interest in "medical coding" and "a nutritional program" after the court entered the decree. But she either did not complete the necessary training to work in those positions or did not "earn any income" from them.

¶ 38 The court concluded that "the testimony and other evidence regarding [wife's] expenses and income," which the court discussed in the child support portion of the modification order, "undermine[d] [wife's] argument that she [was] unable to meet her reasonable needs based upon the maintenance award ordered as

17

part of the [agreement]." *See Trout,* 897 P.2d at 840 ("The fact that a spouse enjoys increased income does not necessarily require the conclusion that an initial award of maintenance has been rendered unconscionable.").

ii. Distribution of Marital Property

¶ 39 In the modification order, the court observed that wife received "the marital home and all of its $256,000 of equity, some mineral rights, as well as two vehicles which were not encumbered by any loans." The court also noted that wife "received little debt" under the agreement. Husband "primarily received the value of his shares in [Grace Management], his vehicle with an encumbrance," and the majority of the marital debt, and he was also required to make the $75,000 equalization payment to wife.

¶ 40 The court found credible husband's testimony that the agreement "was the result of back-and-forth negotiations with both parties represented by counsel" and that it was "precisely the type of global settlement contemplated by the Supreme Court of Colorado." The property and debt division spreadsheet the parties filed together with the agreement supports the court's findings regarding the agreement.

18

¶ 41 Wife failed to persuade the court that husband "pressured her into the [agreement] with misrepresentations that he was going to lose all of his shares in [Grace Management] if they did not settle the property division by the end of [2021]." The court found that husband's father and brother "testified credibly that they fully intended to buy back [h]usband's shares [in Grace Management] to avoid having the shares be subject to division in the parties' dissolution proceedings." It also rejected wife's assertion that such a buyback would result "in the parties being destitute," finding that "the company would have had to pay [h]usband for the value of his shares." Husband's testimony that he would have received "$600,000 of a payout for [his] shares" supports the court's finding.

    iii.   Significant Economic or Noneconomic Contribution to the Marriage or the Advancement of a Party

¶ 42 The court considered whether wife's efforts during the marriage contributed to husband's increased income. It found that the primary cause of the increase was the "acquisition of the additional shares" following husband's mother's death; thus, the increase was "something that happened based on a family circumstance." The court said that it "would likely view" husband's

19

increase in income differently had it "come about due to a promotion or a career change that occurred shortly after the [agreement's execution] and was in part due to the contribution and support of [w]ife during the marriage."

¶ 43 Wife's testimony that, during the marriage, she and husband "frequently" discussed husband's mother's illness, "that she was going to die, [and that] he was going to receive more shares and his income was going to go up" upon her death is consistent with the court's finding.

iv. Guideline Amount and Taxability of Maintenance

¶ 44 In her position statement in the certificate and in her exhibits, wife presented the court with the statutory guideline amount and term for husband's maintenance obligation to her — $9,854.70 per month for seven years and eleven months. The court "considered the exhibits and testimony of the witnesses" in concluding that the original maintenance award had not become unfair.

¶ 45 The court did not examine the taxability of wife's maintenance under section 14-10-114(3)(c)(XII) because maintenance is no longer taxable income for the recipient or deductible by the payor. *See* Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 11051,

131 Stat. 2054, 2089 (repealing 26 U.S.C. § 215) (making maintenance neither taxable nor deductible).

### c.    Summary

¶ 46     The court correctly said in the modification order that, "[i]n making the determination of 'unfairness' with regard to a modification of maintenance, [it] must examine the circumstances pertinent to initially awarding maintenance under [section 14-10-114(3)], including the relevant circumstances of both parties."  *See Young*, ¶ 12, 497 P.3d at 528.  In addition, the court made findings on the credibility of the witnesses who testified at the October hearing.  *See Bowles*, 916 P.2d at 617 ("The trial court as a finder of fact can believe all, part, or none of a witness' testimony, even if uncontroverted.").  The court also said that, after "consider[ing] the exhibits and testimony of the witnesses, and weighing the credibility of the evidence," it could not "conclude that the original maintenance award [was] now unfair."

¶ 47     The record supports the court's conclusion.  When a "court's order is supported by competent evidence, it should not be disturbed on review."  *In re Marriage of Udis*, 780 P.2d 499, 504 (Colo. 1989).  Accordingly, the court did not abuse its discretion by

21

considering the parties' relevant circumstances under section 14-10-114(3) and concluding that those circumstances did not support an increase in the amount of husband's maintenance obligation.

### B. The Court Did Not Err by Denying Wife's Request for Attorney Fees and Costs

#### 1. Standard of Review and Substantive Law

¶ 48 "The allowance of attorney fees [in a dissolution of marriage action] is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion." *In re Marriage of Fernstrum*, 820 P.2d 1149, 1152 (Colo. App. 1991); *see also Bowles*, 916 P.2d at 618-19.

¶ 49 "The purpose of an award of attorney fees under [section 14-10-119] is to apportion costs of dissolution equitably based on the parties' current financial resources." *Weibel*, 965 P.2d at 130. "The award is discretionary, and will not be disturbed on appeal if supported by the evidence." *Id.* If there is a "disparity of income" between the parties but both have "considerable assets," then a court does not abuse its discretion by "requiring each party to pay his or her own fees." *Id.*

22

¶ 50 "[A]s a predicate to an award of [attorney] fees there must be proof of reasonableness premised upon considerations of the amount of the fees charged, the time spent by the attorney, the services rendered, and the prevailing rates in the community." *In re Marriage of Sarvis*, 695 P.2d 772, 774 (Colo. App. 1984); *see also Trout*, 897 P.2d at 840. "Unless otherwise ordered by the court, attorney fees under [section] 14-10-119 should be heard at the time of the hearing on the motion or proceeding for which they are requested." C.R.C.P. 121, § 1-22 cmt. 2.

### 2. Additional Facts

¶ 51 In denying wife's request for attorney fees and costs, the court first found that wife had not made such a request in the motion to increase. The record supports this finding. Second, the court observed that it had "denied [w]ife's request for a modification of maintenance, which was made just five months" after the court entered the decree.

¶ 52 Third, the court explained that wife had "her own income plus $5,273 in maintenance from which she can pay her own attorney[] fees" and had received the assets allocated to her under the agreement. As noted above, those assets included "the marital

home and all of its $256,000 of equity, some mineral rights, [and] two vehicles which were not encumbered by any loans." In addition, husband made the $75,000 equalization payment to wife.

¶ 53     Finally, the court reasoned that denying wife's request for attorney fees and costs was appropriate because "both parties ha[d] incurred attorney[] fees litigating these issues, plus [h]usband incurred the costs of the vocational evaluation."

### 3.     The Court Did Not Abuse Its Discretion by Denying Wife's Request for Attorney Fees and Costs

¶ 54     Wife contends that the court "erred by not ordering [h]usband to pay [w]ife's attorney fees given [h]usband was earning over $30,000 more per month than [w]ife." But section 14-10-119 does not reference gross income; rather, it requires a court to consider the "financial resources of both parties." The court properly examined the parties' financial resources.

¶ 55     Husband testified that his income includes "passthrough income that [he] never receive[s]" and that is taxed "just under 30 percent." Accordingly, husband says, he was required to subtract from his gross income thirty percent for income taxes; $5,273 per month for maintenance; $1,400 per month for child support until

24

October 2024; and $1,150 per month for child support beginning that month.

¶ 56 Husband's maintenance and child support payments are not taxable income for wife, and she is in a low tax bracket given the amount of her employment income. As the court found, wife's total income is not insignificant, and she received a considerable amount of assets under the agreement.

¶ 57 Further, wife did not present sufficient evidence at the October hearing to allow the court to adequately assess the amount and reasonableness of her attorney fee and cost request. Wife first requested an award of fees and costs in her position statement in the certificate, but the request failed to specify the amount of fees and costs she was seeking. Nor did wife file an affidavit indicating the amount of fees and costs she was requesting or any exhibits supporting her request.

¶ 58 The court said it would "allow [wife] to testify generally" to her attorney fee and cost request at the October hearing. The court noted it would then decide whether there was "sufficient evidence to support [wife's] request" and whether the request was "procedurally . . . brought before the court properly."

25

¶ 59    The only evidence wife provided to support her attorney fee and cost request consisted of credit card and bank statements showing charges for and payments to her attorney's law firm.  Wife testified that none of the charges and payments included attorney fees relating to husband's motion to restrict wife's parenting time. But she did not provide any exhibits to support her testimony.

¶ 60    Most significantly, wife did not provide the court with her attorney's billing records or her engagement letter with the attorney. Accordingly, the court had no basis for considering the reasonableness of the fees that wife's attorney billed to her.

¶ 61    Because wife did not meet her burden of proof, the court did not err by denying her attorney fee and cost request.  *See In re Marriage of Connerton*, 260 P.3d 62, 67 (Colo. App. 2010) (Mother's attorney fee request was properly denied because "there was no evidence of the number of hours billed by her attorney nor the reasonableness and necessity of those hours, such as billing records, time records, or other documentary evidence.").

III.    Disposition

¶ 62    The order is affirmed.

JUDGE JOHNSON and JUDGE HAWTHORNE concur.

26